UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

FRANKLIN AMERICAN MORTGATE
COMPANY,

    Plaintiff,                                                Civil Action No. 3:13-CV-01109

vs.                                                          HON. BERNARD A. FRIEDMAN

THE UNIVERSITY NATIONAL BANK OF
LAWRENCE

    Defendant.
_____/

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on the parties' cross motions for summary judgment [docket entries 67 and 69] and defendant's motion to strike excess pages [docket entry 76]. As this matter is fully briefed, the Court will decide these motions without a hearing.

### FACTS

The following facts are summarized from the complaint and the parties' briefing. Plaintiff is a Tennessee mortgage company and defendant is a Kansas bank. In 2005, the parties signed a Correspondent Loan Purchase Agreement ("the Agreement"). The Agreement provides for the sale of residential mortgage loans from defendant (the Seller) to plaintiff (the Buyer) and outlines the parties' respective obligations. Several provisions of the Agreement are pertinent here:

> Section 6: At all times the Seller makes the following representations and warranties: . . .

> 6.2 Complies With Agency[1] Requirements: There is no fact or circumstance with respect to the Mortgage Loan that would entitle: a) an Agency to demand repurchase of a Mortgage Loan; [or] c) . . . an Agency[], to claim indemnification . . . .
>
> 6.20 PMI: Each Mortgage Loan required to have private mortgage insurance has a policy that a) complies with the Agency Guide and the Manual; and b) is issued by an insurer acceptable to the Agency and the Buyer.

> Section 8: Seller agrees to repurchase one or more Mortgage Loans from Buyer, upon terms and conditions hereinafter set forth, in the event that: . . .
>
>> b) Buyer is required to repurchase the Mortgage Loan after it has been sold to an Agency or a Private Investor due to a deficiency in or omission with respect to any documents, instrument, or agreement pertaining to the Mortgage Loan . . .
>
> Any such repurchase shall occur within thirty (30) business days after written demand by Buyer . . . .
>
> Section 10: In addition to the repurchase obligation of Seller and any and all other rights and remedies available to Buyer, Seller shall indemnify the Buyer . . . against any and all losses . . . that the Buyer may incur . . . arising out of:
>
>> a) Any misrepresentation made by the Seller in . . . any information provided to the Buyer, [or]
>>
>> b) Any breach by the Seller of any of the Seller's representations, warranties, or obligations . . . .

In sum, § 8 and § 10 require defendant to, under certain circumstances, repurchase or indemnify plaintiff for defective mortgage loans. This case is about two defective loans that defendant refuses to repurchase or indemnify plaintiff for: the Salvino loan and the Turner loan.

---

[1] The Agreement defines "Agency" to include any private investor—i.e., subsequent purchaser of a mortgage—such as Wells Fargo.

Defendant originated the Salvino loan in early 2006. On June 30, 2006, defendant sold the Salvino loan to plaintiff, who immediately resold it to Wells Fargo. In March 2010, Wells Fargo notified plaintiff of underwriting defects in the Salvino loan, including misrepresentations of the Salvinos' income and credit score. Plaintiff's contract with Wells Fargo—similar to the Agreement—contains repurchase and indemnification clauses. Plaintiff asked defendant to explain the underwriting defects. At the same time, plaintiff appealed Wells Fargo's determination within Wells Fargo. In August 2010, Wells Fargo denied plaintiff's appeal. In September 2010, Wells Fargo demanded that plaintiff repurchase the Salvino loan, which plaintiff did for $116,000 in early November 2010. Plaintiff immediately demanded that defendant repurchase or indemnify it for the Salvino loan, but defendant refused. Plaintiff then sold the Salvino loan for $42,000 on the "scratch and dent" secondary market.

Defendant originated the Turner loan in mid-2007. On September 5, 2007, defendant sold it to plaintiff, who immediately resold it to Wells Fargo. In February 2010, Wells Fargo notified plaintiff of lapsed insurance and underwriting defects in the Turner loan, including misrepresentations of the Turners' income. From then until December 2010, the parties and Wells Fargo exchanged correspondence regarding the Turner loan. Plaintiff appealed Wells Fargo's determination within Wells Fargo, but eventually Wells Fargo denied plaintiff's appeal. Plaintiff indemnified Wells Fargo in November 2010, for $116,689.94.[2] Defendant has refused to indemnify plaintiff.

Plaintiff filed the instant action in October 2013. In February 2016, it filed its amended complaint, which asserts two breach-of-contract claims—one as to the Salvino loan and the other as to the Turner loan. The parties have now filed cross motions for summary judgment.

---

[2] Because the Turner mortgage had been foreclosed and the property sold, or sold via short sale, plaintiff could not repurchase the Turner loan and could only indemnify Wells Fargo.

3

**LEGAL STANDARD**

Under Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* dispute as to any *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). Viewing the evidence in the light most favorable to the opposing party, summary judgment may be granted only if the evidence is so one-sided that a reasonable factfinder could not find for the opposing party. *See id.* at 248–50; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478–80 (6th Cir. 1989). In other words, "[a] material issue of fact exists where a reasonable jury, viewing the evidence in the light most favorable to the non-moving party, could return a verdict for that party." *Vollrath v. Georgia-Pacific Corp.*, 899 F.2d 533, 534 (6th Cir. 1990).

**DISCUSSION**

I. **LAW**

"In a diversity action such as this one, [the Court must] apply the law, including the choice of law rules, of the forum state." *Stenger v. Freeman*, 683 F. App'x 349, 350 (6th Cir. 2017) (internal quotation marks omitted). In Tennessee, a "plaintiff alleging breach of contract must prove: (1) the existence of an enforceable contract, (2) non-performance amounting to a breach of the contract, and (3) damages caused by the breached contract." *Nw. Tenn. Motorsports Park, LLC v. Tenn. Asphalt Co.*, 410 S.W.3d 810, 816–17 (Tenn. Ct. App. 2011) (internal quotation marks omitted). Here, only elements (2) and (3) are at issue. In Tennessee, the

> cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention, consistent

with legal principles. The intention of the parties is to be gleaned
from the four corners of the contract, and the contract's terms are to
be given their "ordinary meaning" in the absence of any ambiguity.
The court, at arriving at the intention of the parties to a contract,
does not attempt to ascertain the parties' state of mind at the time
the contract was executed, but rather their intentions as actually
embodied and expressed in the contract as written.

*United States v. Tennessee*, 632 F. Supp. 2d 795, 800–01 (W.D. Tenn. 2009) (citations and quotation marks omitted). The Court will enforce "unwise or burdensome" contracts. *Id.* at 801.

## II. ANALYSIS

### A. Liability

#### 1. Salvino Loan

Regarding the Salvino loan, defendant breached its contract obligations under § 8 and § 10. Fannie Mae regulations require underwriters to calculate borrower income by averaging the borrower's income information in his W-2 form from the previous year and a current pay stub. Pl.'s Docs. 690.[3] Defendant did not accurately average the Salvinos' W-2s and current pay stubs: for example, defendant disregarded Ms. Salvino's W-2s, overrepresenting the Salvinos' income by over 20% and underrepresenting their debt-to-income ratio by 16%.[4] Def.'s Docs. 35–36, 123, 283–89; Pl.'s Docs. 20–21, 689, 797–98. Wells Fargo required plaintiff to repurchase the Salvino loan because these misrepresentations breached Wells Fargo's contract with plaintiff. Pl.'s Docs. 87, 121–23.

Under § 8(b), defendant must repurchase a loan "in the event that" a subsequent buyer requires plaintiff to repurchase the loan "due to a deficiency in or omission with respect to

---

[3] Plaintiff and defendant have attached Bates-stamped discovery documents. This opinion will refer to all discovery documents by their Bates number.
[4] Defendant admits that the debt-to-income ratio was miscalculated by at least 8%. Pl. Docs. 20.

5

any [loan] documents."[5] *See also Franklin Am. Mortg. Corp. v. Direct Mortg. Corp.*, No. 3:11-CV-00695, August 20, 2013, Order Granting Mot. for Summ. J. ("August 2013 Order") p. 15 (finding that § 8(b)'s plain language requires defendant to repurchase a loan from plaintiff that plaintiff was required to repurchase "from a third party based on a defect or omission that existed" when plaintiff bought the loan). Wells Fargo legitimately demanded under its contract with plaintiff that plaintiff repurchase the Salvino loan because defendant's misrepresentations violated plaintiff's warranties to Wells Fargo. Pl.'s Docs. 22, 87, 121–23, 407–08, 429, 1035–135 (plaintiff warrantying that loan applications contain no untrue statement of fact); Volpe Decl. ¶¶ 6–7, 23.

Under § 10(a), defendant must indemnify plaintiff for all losses arising from defendant's misrepresentation of "any information" in the loan application. Unlike other phrases in the Agreement, the phrase "any information" is not qualified by words like "material"; under § 10(a)'s unambiguous language, defendant must indemnify plaintiff for *any* loss arising from *any* underwriting misrepresentation. Here, Wells Fargo based its repurchase/indemnification request on, and plaintiff repurchased the Salvino loan because of, defendant's misrepresentations. *Id.*

Finally, under § 10(b), defendant must indemnify plaintiff for all losses arising from defendant's breach of a warranty. Under § 6.2(a), defendant warrantied that no fact in the loan application would entitle Wells Fargo to "demand repurchase." But Wells Fargo demanded repurchase explicitly because of defendant's misrepresentations. *Id.*

### 2. Turner Loan

Regarding the Turner loan, defendant breached its contract obligations under § 10. To calculate a borrower's income from rental properties, Fannie Mae requires an underwriter to use the borrower's most recent federal income tax return; in lieu of the tax return, an underwriter

---

[5] Although the parties argue over several § 8 subsections, because no reasonable jury could fail to find that defendant breached § 8(b), the Court need not consider those other subsections.

may use a copy of the current lease agreement. Pl.'s Docs. 867. The Turner loan application listed income from three rental properties, but the attached federal income tax return showed only two properties. Pl.'s Docs. 863, 963. Defendant never attached a copy of the current lease agreement for the third property, but simply listed the Turners' net rental income as $171 annually. Pl.'s Docs. 407–08, 412–14, 426–27; Volpe Decl., ¶ 14. When Wells Fargo recalculated the net rental income, it found that it was actually negative $1,200 yearly—almost $1,400 lower than defendant's calculation. *Id.* Plaintiff requested an amended federal income tax return or current lease agreement, but defendant would not provide them. *Id.* Wells Fargo also noted that the Turners' mortgage insurance was rescinded and never reinstated; defendant has not addressed this issue. Pl.'s Docs. 390–91. The Turner loan was foreclosed or sold via short sale. Volpe Decl. ¶ 15; Pl.'s Statement of Undisputed Facts ("SUF") ¶ 42. Wells Fargo demanded that plaintiff indemnify it for the Turner loan, which plaintiff did.

Under § 10(a), defendant must indemnify plaintiff for all losses arising from its misrepresentation of "any information," or any breach of its warranties. Unlike other phrases in the Agreement, the phrase "any information" is not qualified by words like "material"; under § 10(a)'s unambiguous language, defendant must indemnify plaintiff for *any* loss arising from *any* underwriting misrepresentation. Here, defendant's rental-income misrepresentation formed the basis of Wells Fargo's repurchase/indemnification request. *See* Pl.'s Docs. 402–04, 408, 420, 492–93.

Further, under § 10(b), defendant must indemnify plaintiff for all losses arising from defendant's breach of a warranty. Defendant breached two of its warranties: § 6.2(c) and § 6.20. Defendant warrantied that "no fact" in the loan application would entitle Wells Fargo "to claim indemnification." *Id.* § 6.2(c). But Wells Fargo claimed indemnification explicitly because

7

defendant misrepresented the Turners' rental income. Def.'s Docs. 323. Defendant also warrantied that each loan would be covered by a private mortgage insurance policy. *Id.* § 6.20. But the insurance policy here was rescinded and never reinstated. Pl.'s Docs. 390–91. Therefore, defendant's refusal to indemnify plaintiff for its loss on the Turner loan breached § 10.

In sum, defendant raises no genuine issue as to any of the above-mentioned material facts. Its contention that the applications were still attractive despite misrepresentations does not matter—the question is whether defendant misrepresented facts, which it did. *See, e.g.*, Pl.'s Docs. at 397 (defendant's employee admitting to a miscalculation). Those misrepresentations breached unambiguous Agreement provisions. Therefore, no reasonable jury could fail to conclude that defendant breached its obligation to repurchase under § 8 or indemnify under § 10.[6] However, defendant argues that plaintiff is not entitled to judgment as a matter of law for five reasons, none of which the Court finds persuasive.

### 3. Breach of Contract Defenses

#### a. Statute of Limitations

Defendant argues that the statute of limitations bars both of plaintiff's claims. The Court must answer three questions: whether the statute of limitations began to run in 2006/2007 or in 2010; whether Kansas's five-year or Tennessee's six-year statute of limitations applies; and whether Tennessee's discovery rule applies.

First, the statute of limitations began to run in 2010 when defendant refused to repurchase or indemnify plaintiff, thereby breaching its obligations under § 8 and § 10. A statute-of-limitations defense is not asserted against a complaint generally, but against a specific claim,

---

[6] Defendant argues that the underwriting defects did not cause plaintiff's damages. This is patently false. All of the correspondence between Wells Fargo and plaintiff shows that Wells Fargo required plaintiff to repurchase and indemnify specifically because of what Wells Fargo deemed significant underwriting defects.

8

and that it begins to run when the claim accrues. *See Ternes v. Tern-Fam, Inc.*, 904 F.2d 708, at *2 (6th Cir. 1990) (holding the same). Here, plaintiff asserts that defendant breached the Agreement by refusing to repurchase or indemnify it for the Salvino loan under § 8 or § 10 and by refusing to indemnify it for the Turner loan under § 10. Am. Compl. ¶ 38, 41. Until defendant refused to repurchase or indemnify, plaintiff had no claim under § 8 or § 10. Thus, its claims accrued in 2010.

Defendant resists that conclusion, arguing that plaintiff's claims accrued in 2006/2007 when plaintiff bought the defective loans and defendant breached its § 6 warranties. To the extent plaintiff suffered a loss, defendant argues, that loss occurred when plaintiff bought loans that were less valuable than they appeared. Plaintiff, defendant says, could have demanded repurchase or indemnification in 2006/2007—it did not need to wait for Wells Fargo's demand. Defendant cites Second Circuit case law in support.

The Court rejects these arguments. It is undisputed that in 2006/2007 defendant breached its § 6 warranties. Critically, though, plaintiff has not asserted claims under § 6, but under § 8 and § 10, which defendant did not breach until 2010. The mere fact that defendant breaches one section of the Agreement does not mean plaintiff's claims under every section automatically accrue. This Court rejected that very argument in *Franklin Am. Mortg. Co. v. First Guar. Mortg. Co.*, No. 3:14-CV-2188, Feb. 25, 2015, Order Den. Def.'s Mot. to Dismiss ("Feb. 25 Order") p. 4 (considering this same question and holding that plaintiff's claim did not accrue until defendant refused to indemnify plaintiff). This Court has also found defendant's cited Second Circuit precedent on this question unpersuasive. *See Franklin Am. Mortg. Co. v. JFK Fin., Inc.*, No. 3:14-CV-1232, Mar. 27, 2017, Order Denying Def.'s Mot. to Certify ("Mar. 27 Order") p. 2.

Finally, regarding the § 10 indemnification claims in particular, because plaintiff immediately sold both loans to Wells Fargo for a profit (ignorant of the underwriting defects), it suffered no loss in 2006/2007. Def.'s SUF ¶ 20; Volpe Second Decl. Ex. A. Its first loss was in 2010 when it repurchased the Salvino loan and indemnified Wells Fargo for the Turner loan. *Id.* It was then that its § 10 claims accrued, not before. *See Stiver Mktg., Inc. v. Performance Bus. Forms, Inc.*, No. 01-A-019108CH00276, 1991 WL 254564, at *4 (Tenn. Ct. App. Dec. 4, 1991) (holding that the right to seek indemnity under a contract "does not arise until the indemnitee has actually sustained or suffered loss[—e.g.,] through payment").

Second, as this Court has previously held, Tennessee's statute of limitations applies to plaintiff's claims. *See JFK Fin.*, No. 3:14-CV-1232, Dec. 16, 2016, Order Den. Mots. for Summ. J. p. 3; *Direct Mortg. Corp.*, No. 3:11-CV-00695, Aug. 2013 Order p. 7. Under T.C.A. § 28-1-112, Kansas's statute of limitations applies here "if the following three conditions are met: (1) the defendant was a resident of [Kansas]; (2) the cause of action is barred by [Kansas's] statute of limitations; and (3) the cause of action accrued in [Kansas]."

Here, the parties agree that defendant is a resident of Kansas, so defendant satisfies element (1). But because the statute of limitations began to run in 2010, Kansas's five-year statute of limitations would not bar plaintiff's claims, and defendant fails to show element (2).

Even if the statute of limitations began to run in 2006/2007 and Kansas's statute of limitations barred plaintiff's claims, because this cause of action accrued in Tennessee, defendant fails to show element (3). Where plaintiff's claims accrued is not clear; the parties acted in both Kansas and Tennessee. If "the location of accrual is not readily apparent, this Court has looked to when a cause of action accrued to determine the place of accrual." *Swanson v. Wilson*, 423 F.

10

App'x 587, 593 (6th Cir. 2011). In economic-loss cases such as this one, the injury occurs "where the plaintiff resides and thus 'feels' the loss, not where" defendant acts. *Id.* at 596.

The parties agree that defendant completed the underwriting in Kansas. But as plaintiff notes, the sale was complete only when plaintiff purchased the loan by funding it—the last step in the purchase process. Agreement § 5; Volpe Second Decl. ¶ 4. Until the parties finalized the purchases on June 30, 2006, and September 5, 2007, respectively, Pl.'s SUF ¶¶ 5, 8, plaintiff could not possibly have relied on defendant's contract warranties and, thus, no breach-of-contract claim could have accrued. Plaintiff funded/purchased the loans in Tennessee. Volpe Second Decl. ¶ 6; Volpe Decl. ¶ 4, 24. Thus, it first relied on defendant's warranties in Tennessee, defendant first breached its warranties in Tennessee, and plaintiff felt its loss in Tennessee. Therefore, plaintiff's claims accrued in Tennessee.[7]

Third, as this Court has previously held, even if the Court cannot treat defendant's breaches under § 6 and breaches under § 8 and § 10 separately, Tennessee's discovery rule tolled the statute of limitations until plaintiff learned of the breaches in 2010.[8] In *Goot v. Metro. Gov't of Nashville & Davidson Cty.*, No. M200302013COAR3CV, 2005 WL 3031638, at *11 (Tenn. Ct. App. Nov. 9, 2005), the Tennessee Court of Appeals held that the discovery rule applies to claims brought under Tennessee's breach-of-contract statute. The court stated that "it would be unjust to hold that a plaintiff's claim for breach of contract accrues before the plaintiff knew or should have known that the contract had been breached." *Id.* The Court may apply "the discovery rule in cases where (1) the breach of contract was difficult for the plaintiff to detect, (2) the defendant was in a

---

[7] The Court notes that plaintiff received the Salvino and Turner loan files at its Texas office. Def.'s SUF ¶¶ 8, 16. Thus, plaintiff never viewed the loan applications until they left Kansas. Given this, it was impossible for defendant to have warrantied anything in Kansas—perhaps Texas, and definitely Tennessee, but not Kansas.

[8] *See JFK Fin.*, No. 3:14-CV-1232, Mar. 27 Order at 2, and *First Guar.*, No 3:14-CV-2188, Feb. 25 Order at 4 (citing *CMH Mfg., Inc. v. US Greenfiber, LLC*, 2013 WL 3324292, at *3 (E.D. Tenn. July 1, 2013), and *Bender v. Newell Window Furnishings, Inc.*, 681 F.3d 253, 272 (6th Cir. 2012)) (both applying the discovery rule to plaintiff's claims under this Agreement).

11

far superior position to comprehend the breach and the resulting damage, or (3) the defendant had reason to believe that the plaintiff remained ignorant that it had been wronged." *Id.* at *11–12 (applying the discovery rule because it would have been difficult for the plaintiff to discover the contract breach earlier). Defendant's opposing citations are not persuasive.

Here, based on the evidence, defendant's breach of contract was difficult—if not impossible—for plaintiff to detect, and defendant was in a far superior position to see the breach and resulting damage. Defendant states that the loan defects were easily discoverable at the time of purchase. Sutherland Decl. ¶¶ 14, 20. Plaintiff avers that it would not have known of the underwriting defects without "fully re-underwriting each loan," which it did not do. Volpe Decl. ¶¶ 4 (plaintiff "was purchasing and processing thousands of mortgage loans during that time and did not re-underwrite any loans purchased" from defendant), 6; Volpe Second Decl. ¶¶ 2, 7.

Having reviewed the loan applications, the Court agrees with plaintiff. Without doing the underwriting work itself, plaintiff would not have discovered defendant's misrepresentations. Plaintiff, through the DUA, gave defendant broad underwriting discretion, trusting it to underwrite responsibly; thus, there was even less reason for plaintiff to double check the underwriting. *See, e.g.*, Sutherland Decl. ¶ 6; Def.'s SUF ¶ 3; Pl.'s Apr. 13, 2016, Dep. 212:1–5. Further, this Court rejected defendant's argument in *JFK Financial*, stating that plaintiff "was not required to conduct diligence on its loans purchased from" the defendant and "did not know or have reason to know that" defendant's "representations and warranties about the [loan] were false until . . . Wells Fargo notified [it] of alleged defects in the underwriting materials." No. 3:14-CV-1232, Mar. 27 Order at 4–5. Defendant fails to show that the breaches were easily discoverable. It advances only speculation.

Even if the breaches were discoverable, defendant was in a far superior position to recognize them. Defendant, not plaintiff, underwrote the loan; defendant, not plaintiff, collected the original documents; and defendant, not plaintiff, interacted with the borrowers. In sum, the discovery rule applies to this case.

### b. Delegated Underwriter Amendment

The parties agree that after signing the Agreement, they amended it through the Delegated Underwriter Agreement (DUA). The DUA states, in pertinent part:

> 8. Seller shall repurchase any loan purchased by Buyer hereunder, subject to the terms of Section 8 of [the Agreement]. . . .
>
> 11. This agreement shall be deemed to supplement and to the extent inconsistent, modify the [Agreement, which] shall remain in full force and effect as supplemented and modified hereby.

Pl.'s Docs. 1192–93. Defendant argues that DUA § 8 amended the Agreement such that plaintiff's only contract remedy is repurchase, not indemnification. It argues that the word "shall" amends the Agreement to leave repurchase as plaintiff's only remedy.

Defendant misinterprets DUA § 8. In context, DUA § 8 simply means that when plaintiff requests that defendant repurchase one of defendant's DUA loans, Agreement § 8 "shall" control plaintiff's request. DUA § 8 does not suggest that repurchase is plaintiff's only remedy. As the DUA is not inconsistent with the Agreement, DUA § 8 does not modify the Agreement. Defendant also argues that the DUA gave defendant such broad discretion in underwriting loans that loan-application misrepresentations do not necessarily breach the Agreement. The DUA gives defendant broad discretion, but not discretion to misrepresent information.

### c. Claims under § 10

Defendant argues that it is entitled to summary judgment because plaintiff has not provided documentary evidence that it had a contract with Wells Fargo or that its contract included

repurchase and indemnification provisions. The Court disagrees. There is no question that plaintiff has a contract with Wells Fargo and that their contract contains repurchase and indemnification provisions similar to those in the Agreement. Pl.'s Docs. 1035–135.

Defendant also argues that plaintiff's repurchase and indemnification were not justified and that it paid Wells Fargo merely to maintain a business relationship. Defendant cites *Globe Am. Cas. Co. v. The Heuer Ins. Agency, Inc.*, No. E200501805COAR3CV, 2006 WL 1864524, at *5 (Tenn. Ct. App. July 5, 2006), for its holding that a "party seeking indemnification under the common law for settlement costs much [sic] prove that its payment was not made voluntarily or gratuitously but rather because of or by virtue of its actual liability."

The Court rejects this argument for three reasons. First, plaintiff's indemnification claim is not made under common law, but under the Agreement, Am. Compl. ¶¶ 38, 41; Def.'s SUF ¶ 25, so *Globe Am. Cas. Co.* is inapplicable, *see Jones Exp., Inc. v. Watson*, No. 3:10-CV-140, 2011 WL 1303164, at *11 (M.D. Tenn. Mar. 31, 2011).

Second, the Tennessee Court of Appeals has explained that

> [o]ne who has voluntarily paid a claim is not required to show that he was legally compelled to pay the claim in order to obtain indemnification, but only that he could have been compelled at law to pay it. Accordingly, where a person is confronted with an obligation that he cannot legally resist, the fact of voluntary payment does not negative the right to indemnity, as he is not obligated to wait to be sued and to lose reasonable opportunity for compromise.

*Stiver Mktg., Inc.*, 1991 WL 254564, at *5. Therefore, although plaintiff repurchased from and indemnified Wells Fargo before Wells Fargo took legal action, if Wells Fargo could have compelled plaintiff to pay plaintiff need not show actual liability. Having reviewed the evidence and plaintiff's contract with Wells Fargo, the Court finds that there is no question that defendant's misrepresentations violated several clauses of that contract; that Wells Fargo was entitled to turn

14

to plaintiff for repurchase or indemnity; and that plaintiff repurchased the Salvino loan and indemnified Wells Fargo for the Turner loan. Pl.'s Docs. 373–74, 1035–135; Volpe Decl. ¶¶ 7, 17–18, 23; Volpe Second Decl. ¶ 5; Def.'s SUF ¶¶ 22–23. Therefore, plaintiff's repurchase of and indemnification for those loans were justified.

Third, plaintiff appealed Wells Fargo's decision for many months within Wells Fargo before repurchasing and indemnifying; it did not voluntarily or gratuitously pay. *Id.* ¶ 12. *See* Pl.'s Docs. 20–23, 82.

### d. Salvino Loan Modification

Defendant argues that by modifying the Salvino loan, Wells Fargo and the Salvinos created a new loan, which defendant is not required to repurchase. Plaintiff, defendant argues, admitted to this in its deposition. Plaintiff's corporate officer avers that her admission was a legal conclusion she was not entitled to make and that it was wrong. Volpe Decl. ¶¶ 3, 8. Defendant argues that her affidavit is a sham affidavit.

The Salvino loan modification did not create a new loan. The loan was not substantially rewritten; the parties changed only two dates, the loan principal, and monthly payments. Def.'s Reply p. 13. Further, the amending document is called a "modification"—strong evidence that the parties did not intend to create a new loan. Pl.'s Docs. 215. Additionally, the modification's terms explicitly state that it is not a new loan, but an amendment: "Nothing in this agreement shall be understood or construed to be a satisfaction or release, in whole or in part of the Borrower's obligations under the Note or Mortgage. Further, except as otherwise specifically provided in this Agreement, the Note and Mortgage will remain unchanged." Pl.'s Docs. 216. That the Salvino loan was *not* satisfied or released shows that this was an amendment of limited scope, as confirmed by defendant's own evidence. *See* Def.'s SUF ¶ 12; Def.'s Docs. 646–47.

Plaintiff's corporate officer's erroneous statement does not present a genuine issue of material fact. Her testimony was her personal opinion regarding a legal conclusion with which the Court disagrees for the reasons stated above. The modified Salvino loan is not a new loan.

e. Affirmative Defenses

Defendant argues that plaintiff has conceded certain of defendant's twenty-four affirmative defenses by failing to specifically address them by name in plaintiff's motion for summary judgment.

The Court rejects this argument for two reasons. First, defendant's "affirmative defenses" appear to be boilerplate, and many simply do not apply. Plaintiff need only address developed affirmative defenses, *see United Mine Workers of Am. 1974 Pension v. Pittston Co.*, 984 F.2d 469, 478 (D.C. Cir. 1993) (holding that "the failure to raise an affirmative defense in opposition to a motion for summary judgment constitutes an abandonment of the defense."), which it has done.

Second, as plaintiff notes, it has addressed each of defendant's twenty-four affirmative defenses in one way or another. Pl.'s Reply Br. p. 3. The United States District Court for the District of Wisconsin addressed this precise issue in *United Cent. Bank v. Wells St. Apartments, LLC*, 957 F. Supp. 2d 978, 987–88 (E.D. Wis. 2013), stating:

> The defendants point out that they raised a number of affirmative defenses to UCB's foreclosure claims in their answer and that UCB did not mention those defenses in its motion for summary judgment. Therefore, reason the defendants, those defenses remain viable and UCB has not yet shown that it is entitled to a judgment of foreclosure and sale. . . . I conclude that a rule applied by other courts—the rule that the failure to raise an affirmative defense in opposition to a motion for summary judgment constitutes an abandonment of the defense—is the better rule. This is the better rule because when a plaintiff moves for summary judgment on an entire claim (as opposed to only part of a claim or only on a defense to the claim), it is asking for judgment on that claim as a matter of law. The

> existence of factual disputes concerning an affirmative defense
> would be a reason to not grant the plaintiff judgment as a matter of
> law, even if there are no factual disputes concerning the plaintiff's
> claim itself. Thus, when the plaintiff moves for summary judgment
> on an entire claim, it is necessarily also moving for summary
> judgment on any affirmative defenses to that claim. It is therefore
> incumbent on a defendant that wishes to prevent entry of summary
> judgment on the claim to come forward with evidence showing the
> existence of a genuine factual dispute concerning an affirmative
> defense that, if ultimately successful, would defeat the claim. If the
> defendant does not come forward with such evidence, and the
> plaintiff otherwise shows that it is entitled to judgment as a matter
> of law on its claim, then the affirmative defense is extinguished.

This is an accurate statement of Rule 56 procedure. And as the Court already noted, those few defenses defendant supported with evidence plaintiff has fully rebutted.

### B. **Damages**

Plaintiff seeks damages in the amount of $72,168.77 for the Salvino loan and $118,184.06 for the Turner loan. Am. Compl. ¶¶ 39, 42. However, because plaintiff has alleged facts sufficient to show only $116,689.94 in Turner loan damages, Volpe Decl. ¶ 17–19, the most the Court can award is $188,858.71.

Defendant argues that there are genuine issues of material fact as to Salvino loan damages, but not as to the Turner loan damages. Defendant argues that it is not clear that plaintiff fully mitigated its damages, especially since broker price opinion ("BPO") estimates of the Salvino loan's value fluctuated over time. Further, defendant believes that selling the Salvino loan as part of a larger defective-loan bundle reduced its value. Plaintiff responds that it reasonably mitigated its damages and avers that it needed to quickly sell the Salvino loan because it does not administer/service loans. *Id.* ¶ 25.

The Court disagrees with defendant for two reasons. First, defendant's mitigation argument rings hollow given that it refused to repurchase the performing Salvino loan when it had

the chance and when it was contractually obligated to do so. Second, defendant has not produced evidence sufficient for a reasonable jury to find that plaintiff failed to mitigate damages. Defendant bears the burden of producing evidence of a failure to mitigate. *See Action Ads, Inc. v. William B. Tanner Co.*, 592 S.W.2d 572, 575 (Tenn. Ct. App. 1979). "The critical factor in determining" whether plaintiff mitigated "is whether the method [it] employed to avoid consequential injury was reasonable under the circumstances existing at the time." *Erection Specialists, Inc. v. Edwards Deutz Diesel, Inc.*, No. 3:00-CV-281, 2005 WL 1522104, at *9 (E.D. Tenn. June 28, 2005) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 214 F. Supp. 647, 652 (M.D. Tenn. 1963)). Plaintiff need not "make extraordinary efforts" to mitigate. *Carolyn B. Beasley Cotton Co. v. Ralph*, 59 S.W.3d 110, 115 (Tenn. Ct. App. 2000).

In the instant case, defendant has not produced evidence from which a reasonable jury could conclude that plaintiff's mitigation was unreasonable. Plaintiff testified in detail about the process it uses to sell a repurchased, defective loan: it distributes the loan data to an investor pool, takes bids, and sells the loan to the highest bidder. Pl.'s Sept. 15, 2017, Dep. 287–88. There is nothing unreasonable about this process, especially considering that plaintiff must quickly sell repurchased loans because it does not service them.

Further, defendant's BPO speculations do not create a genuine factual dispute. Defendant cannot merely surmise that plaintiff *may* have gotten more for the Salvino loan. As plaintiff testified, BPOs are not reliable indicators of actual worth; the divergence of BPO estimates here confirms that. In sum, plaintiff has presented evidence showing its damages as Rule 56(c) requires. *See, e.g.*, Pl.'s Docs. 155–58, 354.

Under Rule 56(e), defendant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986). It has not, however, presented evidence showing that plaintiff's mitigation process was unreasonable. Having failed to present any evidence on this point, defendant also fails to meet its burden under Rule 56(e). There is no genuine issue of material fact as to damages.

Accordingly,

IT IS ORDERED that plaintiff's motion for summary judgment is granted.

IT IS FURTHER ORDERED that damages are awarded for plaintiff in the amount of $188,858.71.

IT IS FURTHER ORDERED that defendant's motion for summary judgment is denied.

IT IS FURTHER ORDERED that defendant's motion to strike excessive pages is denied as moot.

Dated: December 14, 2017  
    Detroit, Michigan

s/Bernard A. Friedman  
BERNARD A. FRIEDMAN  
SENIOR UNITED STATES DISTRICT JUDGE  
SITTING BY SPECIAL DESIGNATION